Holland v. Buck Mountain Prop. Owners Ass'n, Inc., 2020 NCBC 90.

STATE OF NORTH CAROLINA

WILKES COUNTY

BRIAN HOLLAND; and HARRY
BRIZUELA, derivatively on behalf of
Buck Mountain Property Owners
Association, Inc.,

        Plaintiffs,

    v.

DANA WARREN and JOSEF BATH,

        Defendants,

    v.

BUCK MOUNTAIN PROPERTY
OWNERS ASSOCIATION, INC.,

        Nominal Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 954

**ORDER AND OPINION ON THE
PARTIES' CROSS MOTIONS FOR
SUMMARY JUDGMENT**

1. THIS MATTER is before the Court on Plaintiffs Brian Holland and Harry Brizuela's (collectively, "Plaintiffs") Motion for Summary Judgment, (ECF No. 27), and Defendants Dana Warren ("Warren") and Josef Bath's ("Bath"; collectively, "Defendants") Motion for Summary Judgment, (ECF No. 29), (collectively, the "Motions") made pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"). Having considered the Motions, supporting briefs, and attached exhibits, as well as arguments of counsel, the Motions are GRANTED in part and DENIED in part.

*Thurman, Wilson, Boutwell & Galvin, P.A. by Thomas J. Thurman and Alexander W. Warner for Plaintiffs.*

*Cranfill Sumner & Hartzog LLP by Meredith FitzGibbon Hamilton and Patrick H. Flanagan for Defendants.*

Gale, Senior Judge.

## I.      INTRODUCTION

2.      Plaintiffs are members of Buck Mountain Property Owners Association (the "Association" or the "POA") and seek relief for what they contend were breaches of fiduciary duty by Defendants when engaging in improper interested transactions with the POA while they served as members of its governing Board of Directors (the "Board").  Defendants contend that the transactions were proper, were entered into for the POA's interest rather than their personal interests, and were either approved by or later ratified by a disinterested Board consistent with N.C.G.S § 55A-8-31. Plaintiffs claim that the Board had no authority either to approve or ratify the transactions because they were not authorized by the Association's bylaws pursuant to N.C.G.S. § 47F-3-118(c), even if otherwise potentially proper under N.C.G.S. Chapter 55, Article 8.

3.      Plaintiffs and Defendants each seek summary judgment following the close of discovery.  For the following reasons, the Court determines that, with the exception of one challenged transaction, neither party is entitled to summary judgment on the current record.  As to that one transaction, Defendants are entitled to summary judgment.

## II.   PROCEDURAL HISTORY

4.   Plaintiffs initiated this action on August 17, 2018.  (Compl., ECF No. 3.) This matter was designated as a mandatory complex business case by order of Chief Justice Mark Martin on November 14, 2018, (ECF No. 1), and assigned to the undersigned on November 15, 2018, (ECF No. 2).

5.   Plaintiffs, with leave of court, filed an Amended Complaint on March 6, 2019.  (Am. Compl., ECF No. 19.)  Following the completion of discovery, Plaintiffs and Defendants each filed their Motions for Summary Judgment.  (Pls.' Mot. Summ. J., ECF No. 27; Defs.' Mot. Summ. J., ECF No. 29.)

6.   The Motions have been fully briefed, the Court has heard oral argument, and the Motions are ripe for determination.

## III.   FACTUAL BACKGROUND

7.   The Court does not make findings of fact when ruling upon a motion for summary judgment.  *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975).  The Court summarizes matters of record to provide context for its ruling.

8.   Buck Mountain is a community in Wilkes County, North Carolina.  (N.C. Sec'y State Search, Ex. A, ECF No. 27.1; Decl. Covenants & Conditions, Ex. B, ECF No. 27.1.)  Warren and Bath were at relevant times members of the POA Board. Warren was elected in 2014, (Dep. Dana Warren 9:9–11 [hereinafter "Dep.

Warren"])[1], and Bath in 2016, (Dep. Josef Bath 9:3–4 [hereinafter "Dep. Bath"]).[2] Warren also served as the POA's president at all relevant times. (Dep. Warren 102:22–23.)

9. The Complaint challenges multiple transactions between Warren, Bath, and the Board, each of which is described below.

A. **Easements to Enable the Emergency Access Road**

10. Buck Mountain originally had only one entrance that occasionally flooded and prevented emergency access to the community. (Aff. Pat Dale ¶ 5, ECF No. 30.7.) In early 2016, the Board discussed obtaining an emergency road that would provide the community and emergency services with a second point of access on and off the mountain. (Dep. Warren 17:12–23; Aff. Pat Dale ¶ 5.) At that time, property owners within the community were unwilling to provide the necessary easements. (Bd. Mins. May 21, 2016, Ex. I, ECF No. 27.3.)

11. In November 2016, the POA learned that lots Deer Run Lot 52 ("Lot 52") and Deer Run Lot 54 ("Lot 54") were subject to foreclosure proceedings. Lot 52 adjoined a proposed route for an emergency access road. (Dep. Warren 25:16–28:11.) Warren testified that the Association's sole interest in Lot 52 would be for an easement and the POA's ability to resell the lot was uncertain because of statutory requirements that any such sale would require a supermajority vote of all Association members. (Dep. Warren 26:11–29:1.) The POA ultimately decided not to bid on the

---

[1] Excerpts from Volume I of the deposition of Warren are located at ECF Nos. 27.2 and 34.1.

[2] Excerpts from the deposition of Bath are located at ECF Nos. 27.3 and 30.5.

property at the foreclosure sale. (*See* Bd. Mins. Nov. 19, 2016, Ex H, ECF No. 27.3.) During the POA discussions, Warren inquired whether the Board would grant "an individual" a three-year moratorium on POA dues should that individual purchase Lot 52 and grant the POA an easement, which idea some directors then "kicked . . . around[,]" although no Board vote on that issue was taken at that time. (Dep. Warren 29:4–30:10.)

12. On December 15, 2016, Warren purchased both Lot 52 and Lot 54 for $6,000 and $4,800 respectively. (Deer Run Deeds, Ex. L, ECF No. 27.5.) Two days after the purchase, the POA voted to approve a three-year moratorium on dues for Lot 52 while the POA continued to discuss possible routes for an emergency road, with the provision that during this period Warren would make no improvements unrelated to the emergency access road. (Bd. Mins. Dec. 17, 2016, Ex. J, ECF No. 27.4.) The Board records show that the Board knew that Lot 52 "was purchased at auction by Dana Warren." (Bd. Mins. Dec. 17, 2016.) Warren abstained from voting. (Bd. Mins. Dec. 17, 2016.) The other four Board members present voted to approve the moratorium. (Bd. Mins. Dec. 17, 2016.) The POA did not charge Warren dues on Lot 52 from 2017 through 2019. (Dep. Dana Warren Volume II 98:16–19 [hereinafter "Dep. Warren II"].)[3]

13. Warren also met with Paul Breeden ("Breeden") who owned an approximately eighteen-acre tract of land lying between the Buck Mountain community and U.S. Highway 421, through which the proposed emergency road route

---

[3] Excerpts from Volume II of the Warren deposition Warren are located at ECF Nos. 27.4 and 30.14.

traversing Lot 52 would run (the "eighteen-acre tract" or the "Breeden Tract"). (Dep. Warren 36:9–37:1.) Warren testified that he sought to purchase the Breeden Tract "simply to get an easement across it for the association[,]" (Dep. Warren 37:14–15), but also planned to "get [his] money back out of it[,]" hoping to at least break even as to the purchase of the eighteen-acre tract while potentially earning a profit regarding his purchase of the two Deer Run lots. (Dep. Warren 37:15–16; 154:17–19). In January 2017, Warren agreed to purchase the Breeden Tract and a deed was recorded on February 17, 2017. (Dep. Warren 36:2–37:4; N.C. Gen. Warranty Deed, Ex. L. ECF No. 27.5.)

14. Warren considered several different projects for the Breeden Tract, including building a restaurant or a bar. (Dep. Warren 37:21–38:25.) He ultimately settled on building single-family homes. (Dep. Warren 87:2–89:8.)

15. Board minutes do not reflect any discussion Warren had with the Board in advance of his purchasing the Breeden Tract although Warren was "confident that the board was aware of all of [his] steps, including that [he] was going to talk to . . . [Breeden] to understand how to gain an easement on the 18-acre tract," whether "negotiating directly with him just for an easement . . . or purchasing the lot and granting the easement back to the association" "[b]ecause that is the habit of how [he] operate[s]." (Dep. Warren 69:7–17.)

16. In March 2017, the POA approved construction for the emergency access road that would run across Lot 52 and the eighteen-acre tract to US 421. The Board authorized Warren to execute any necessary easements. (Bd. Mins. Mar. 4, 2017, Ex.

P, ECF No. 27.6.)  Of the five board members present, Warren abstained and the remaining four directors, including Bath, approved the plan.  (Bd. Mins. Mar. 4, 2017.)  The minutes reflect that "the Board of Directors [was] aware that two of the tracts of land through which the road will pass [were] owner [sic] by the President . . . , and the Board [was] confident that the private purchase of these tracts was undertaken by the President to obtain access on behalf of the association[.]"  (Bd. Mins. Mar. 4, 2017.)  Warren subsequently conveyed an easement to the POA across portions of both Lot 52 and the Breeden Tract, and the POA agreed to construct and maintain the road for at least ten years (the "Easement Agreement").  (Right Way Agreement & Deed Easement, Ex. Q, ECF No. 27.6.)  Construction was completed by August 2017 at a total cost of $147,880.29, which came from the POA's budget and reserves.  (Bd. Mins. Aug. 12, 2017, Ex. S, ECF No. 27.6; Dep. POA 17:16–18:4.)[4]

17.    Warren first approached Bath about a construction project involving Lots 52 and 54 in November 2017.  (Dep. Bath 34:15–35:23.)  On December 1, 2017 and January 13, 2018, Bath signed two promissory notes investing a total of $100,000 in the construction project and agreeing to share profits and risks with Warren through Warren's company, Warren Point, Inc. (collectively, "Profit Sharing Agreement").  (Promissory Note & Profit Sharing Agreement, Ex. V [hereinafter "Profit Sharing Agreement"], ECF No. 27.9.)  The record includes no evidence that Bath was aware of any such potential project when the Board voted in December 2016 and March 2017 to approve the dues waiver for Lot 52 and the easements across Lot

_____

[4] Excerpts from the Rule 30(b)(6) deposition of the POA are located at ECF Nos. 27.7 and 30.1.

52 and the Breeden Tract.  There is no evidence that Warren and Bath later discussed their construction project with the Board, and there is no record indication that the Board became aware that through this project Bath had become connected with Warren's company, Warren Point, Inc.  Defendants listed Lots 52 and 54 for $34,000 and $29,400 and constructed homes on them.  (Lazy Bear Homes Listings, Ex. M, ECF No. 27.5.)

18.    In August 2018, the POA modified the Easement Agreement to provide that the POA would only pay for half of the maintenance  if more than one house was built on the "fire road that ran through the 18 acres," and to require that the owners of any such residences assume responsibility for paying the other half.  (Dep. POA 107:11–24.)

## B.    The Lawrimore Tract and Friends of Buck Mountain

19.    In March 2017, Warren received a call from a realtor notifying him that an approximately twenty-three-acre tract of land adjoining the Buck Mountain community and owned by a Ms. Lawrimore (the "Lawrimore Tract") was available for sale at $2,000 per acre.  (Dep. Warren 101:25–02:7; Dep. Warren II 17:12–18:15.)  The record does not reflect that Warren advised the Board of the realtor's call or that the Board itself considered purchasing the tract from Ms. Lawrimore.  Warren signed an offer to purchase the tract and then attempted to find others to invest with him in the purchase.  (Dep. Warren 102:11–17.)

20.    Warren formed Friends of Buck Mountain ("FOBM") in July 2017 as a "philanthropic" corporate entity, which was owned in part by Warren, Bath, and

Connie Thomas ("Thomas"), the wife of POA Board member Bridgett Wells. (Dep. Warren 100:3–16, 101:8–11, 102:20–22; Def.'s First Suppl. Resps. Pls.' First Set of Interrogs. & Reqs. Produc. Docs. Def. Warren, Ex Y, ECF No. 27.9; Dep. Brian Holland 75:11–12, ECF No. 30.11.) Bath testified that when he invested in FOBM, he was not sure whether the entity would keep the tract or ultimately sell it, (Dep. Bath 88:10–89:7), but that any profit achieved from the purchase would be given to the POA, (Dep. Bath 94:2–14).

21. On July 31, 2017, FOBM purchased the Lawrimore Tract for $47,500. (N.C. Gen. Warranty Deed, Ex. AA, ECF No. 27.10.) The upper portion of the tract was only accessible by all-terrain vehicles. FOBM separately purchased a lot for $32,000 across which it granted the POA an easement allowing members access to the top of the Lawrimore Tract by car. (Dep. Warren 106:1–09:5.)

22. In November 2017, Warren approached the Board regarding its possible purchase of the Lawrimore Tract from FOBM. (Dep. Warren II 20:20–21:8.) Warren testified that he had disclosed his membership in FOBM to the Board, but had not disclosed other owners, including Thomas and Bath, because doing so might "hamstring [him] and [his] ability to raise money on behalf of the association in the future." (Dep. Warren II 29:17–31:22; Dep. Bath 92:9–21.) At least one director "was aware that Dana Warren was the primary member of [FOBM]," and two others were aware that Mr. Warren and Mr. Bath were both members of FOBM. (Aff. Robert Ferguson ¶ 10, ECF No. 30.8; Aff. Bridget Wells ¶ 10, ECF No. 30.6; Dep. Brenda Pue-Gilchrist 52:12–19, Ex. BB [hereinafter "Dep. Pue-Gilchrist"], ECF No. 27.10.)

23. In January 2018, the Board voted to purchase a portion of the Lawrimore Tract presented at the per acre price FOBM had paid. (Bd. Mins. Jan. 20, 2018, Ex. CC, ECF No. 27.10.) The proposal passed with approval by four of the six directors present, including Bath and Wells. (Bd. Mins. Jan. 20, 2018.) Of the two remaining directors, Warren abstained from voting and one director opposed the transaction. (Bd. Mins. Jan. 20, 2018.)

24. The POA bylaws require a second vote for this type of purchase. (Bylaws, Ex. U, ECF No. 27.8.) The Board again voted in favor of the transaction on March 17, 2018, with Warren and Bath abstaining and five other directors, including Wells, voting in favor. (Aff. Robert Ferguson ¶ 10; Dep. Bath 178:8–20; Bd. Mins. Mar. 17, 2018, Ex. D, ECF No. 30.8.)

25. The POA then closed on its purchase of the portion of the Lawrimore, paying $40,200 plus approximately $7,600 representing the expenses FOBM had incurred beyond its purchase price on lot improvements. (Contract Sale & Purchase Real Estate, Ex DD [hereinafter "Lawrimore Contract"], ECF No. 27.11.) The POA's purchase included less than the entire twenty-three acres FOBM had initially acquired. (Lawrimore Contract.) FOBM members carved out a portion of the Lawrimore Tract in order to allow FOBM the possibility to recover its purchase of the additional lot necessary to afford POA members access to the top of the Lawrimore Tract. (Dep. Warren II 25:5–7.) FOBM retained approximately three acres of the Lawrimore Tract, which was the only portion of the tract on which a house could "realistical[ly]" be built, considering road access issues. (Dep. Bath 104:4–23; Dep.

Warren 107:20–09:2.) FOBM contemplated subdividing the three retained acres into three separate lots for future sale. (Dep. Bath 97:3–15; Dep. Warren 107:20–109:5.)

26. The relevant deed to the POA included a map and represented that FOBM was selling approximately twenty acres of the approximately twenty-three acres it owned. (*See* Lawrimore Contract.) The Board minutes do not otherwise indicate whether the Board was aware of the FOBM's plan for the three-acre tract it was retaining. Warren testified that FOBM "would have talked about" the fact that "only a parcel" of the twenty-three acres would go to the POA, as purchasing the separate lot at market price and granting an easement through it "would, in [FOBM's] opinion, substantially, have reduced the ability to resell" the lot. (Dep. Warren II 24:13–22.)

### C. Contract with EH Services

27. For several years, the POA retained Ed Harrison ("Harrison") to do various work in the Buck Mountain Community. (Aff. Bridget Wells ¶ 11). Harrison had extensive knowledge of the community and was involved in designing its road system. (Aff. Ed Harrison ¶¶ 5–7 [hereinafter "Aff. Harrison"], ECF No. 30.13). Harrison also participated in determining the best route for, and then constructing, the emergency access road. (Aff. Harrison ¶ 18.)

28. At some point, Warren formed EH Services, an entity owned by Warren Point, Inc., to assist Harrison in financing contracting equipment. (Dep. Warren 130:16–21; 133:24–35:22.) EH Services contracted with the POA, and EH Services in

turn paid Harrison for his services, the financed equipment, and other business-related expenses. (Dep. Warren 135:15–22.)

29. Board records include an unsigned and undated Related Party Acknowledgement ("RPA") which states that Warren owns EH Services through Warren Point, Inc., that he will often direct Harrison's work, and that the Board approves use of EH Services. (Related Party Acknowledgement, Ex HH [hereinafter "RPA"], EC No. 27.12.) The Board discussed the RPA in January 2018. (Aff. Bridget Wells ¶ 12; Aff. Pat Dale ¶ 17; Aff. Robert Ferguson ¶ 12.) At least one director "was informed that EH Services was a d/b/a of Warren Point, Inc." (Aff. Robert Ferguson ¶ 12.) However, one board member testified that she did not know that EH Services was one of Warren's companies. (Dep. Pue-Gilchrist 111:16–112:12.) Board records do not document whether the Board ultimately approved the RPA, although two members recalled having voted in favor of it. (Aff. Bridget Wells ¶ 12; Aff. Pat Dale ¶ 17.)

30. Invoices indicate that EH Services performed work for the POA in December of 2017, in advance of the Board's discussion of the RPA in January 2018 and its subsequent payments to EH Services. (EH Services Invoice, Ex. GG, ECF No. 27.11.) EH Services' invoice for December services was dated January 15, 2018. (POA Invoices, Ex. FF, ECF No. 27.11.) The record does not document when that invoice was paid.

## D. The Voluntary Paving Project

31. Plaintiffs complain that the POA improperly approved and Warren improperly committed the POA to excessive debt in connection with a community paving project.

32. In 2017, the POA approved a paving project (the "Voluntary Paving Project") which required lot owners to pay for paving they wanted done in the community. (Voluntary Pavement Policy, Ex. II, ECF No. 27.12.) This project was to be funded "by members on a voluntary basis," (Strategic Improvement Project, Ex. JJ, ECF No. 27.12), and was implemented in response to strong member interest, (Bd. Mins. Mar. 17, 2018). The Board "had been approached to ask for private donations[.]." (Dep. Pue-Gilchrist 96:10–13.) The Board later noted that "[s]everal members of the community have agreed to a special assessment to pay for a portion of the project cost, as did a similar group in 2017 when the Board funded a portion of paving [in another area.]" (Bd. Mins. Mar. 17, 2018.)

33. In or around March 2018, a group of POA members solicited donations from the community and raised approximately $141,500.00. (Dep. Pue-Gilchrist 93:12–95:24; Dep. POA 56:7–10.)

34. The record includes an undated document, unanimously approved by seven Board members, including Warren and Bath, which authorized Warren to procure a bank loan to supplement the project's funding that would be "favorable to the association with maximum annual payments not exceeding the budgeted annual road reserve contribution of $74,000 in road reserves and a term not exceeding six

years[,]" with a total estimated cost not to exceed $350,000. (Strategic Improvement Project.)

35. In July 2018, Warren obtained a loan for the POA for $350,000 with annual payments of $58,333.33. (Great State Bank Loan Agreement, Ex. KK. [hereinafter "Loan Agreement"], ECF No. 27.12.) Monthly interest payments commenced in September 2018, five annual payments beginning March 2019, and a final balloon payment due in March 2024. (Loan Agreement.)

36. As of December 2018, the POA's reserve account contained $39,983.54. (Statement Fin. Position, Ex. 6, ECF No. 33.1.)

**E.    The Board's Ratification of Property Transactions**

37. Plaintiffs' lawsuit was filed in August 2018. (*See* Compl.) In April 2019, the Board ratified "all actions of Dana Warren and Josef Bath related to the fire road and [the Lawrimore Tract]." (Bd. Mins. Apr. 20, 2019, Ex. E, ECF No. 30.7; Resolution Buck Mountain Prop. Owners Ass'n Supp. Actions Dana Warren & Josef Bath, Ex. F [hereinafter "Resolution"], ECF No. 30.7.)

38. The Resolution stated that "the Board of Directors was aware of Dana Warren's actions related to the creation of the fire road and supported his actions in obtaining property near the subdivision[,]" "the actions of Mr. Warren have been undertaken with the knowledge and support of the Board of Directors," and the POA "reaffirms and ratifies all actions of Dana Warren and Josef Bath related to the fire road and the [Lawrimore Tract]." (Resolution.) Of the six directors present, Warren

and Bath abstained, and Wells was among the remaining four who voted in favor of the Resolution. (Bd. Mins. Apr. 20, 2019.)

## IV.    STANDARD OF REVIEW

39.    Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). "Summary judgment is improper if any material fact is subject to dispute." *Culler v. Hamlett*, 148 N.C. App. 389, 391, 559 S.E.2d 192, 194 (2002). The movant bears the burden of proving the lack of a triable issue. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). Once the movant has met that burden, the burden shifts to the nonmoving party to produce a forecast of evidence that demonstrates facts showing that it can establish a prima facie case at trial. *Austin Maint. & Constr., Inc. v. Crowder Constr. Co.*, 224 N.C. App. 401, 407, 742 S.E.2d 535, 540 (2012). The Court must view the evidence in the light most favorable to, and draw any reasonable inferences in favor of, the nonmoving party. *Gaynoe v. First Union Corp.*, 153 N.C. App. 750, 753, 571 S.E.2d 24, 26 (2002).

## V.    ANALYSIS

40.    Plaintiffs contend that Defendants (i) breached their fiduciary duties under N.C.G.S. § 55A-8-30(a) and N.C.G.S. § 47F-3-118(c), (Br. Supp. Pls.' Mot. Summ. J. 10, 14 [hereinafter "Pls.' Br."], ECF No. 28), which (ii) constitutes constructive fraud by "t[aking] advantage of their positions of trust and confidence in

order to bring about transactions that benefitted themselves[,]" (Am. Compl. ¶ 56; Pls.' Br. 18). Defendants contend that a disinterested board approved each transaction, and that the transactions were pursued for the benefit of the POA rather than for improper personal benefit, precluding any finding of constructive fraud. (Mem. Law. Supp. Defs.' Mot. Summ. J. 12, 18 [hereinafter "Defs.' Br."], ECF No. 30; Resp. Opp'n Pls.' Mot. Summ. J. 8, 15 [hereinafter "Defs.' Br. Opp'n"], ECF No. 32.)

### A. Breach of Fiduciary Duty

### (1) The Applicable Statutory Standard(s)

41. To the Court's knowledge, this case presents an issue of first impression as to the interplay of two statutory provisions defining the duty of a director of a property association board when engaging in a conflict-of-interest transaction.

42. Section 55A-8-30(a) defines standards of conduct for directors of all non-profit corporations. In general, a director of a North Carolina corporation shall discharge his duties "[in] good faith," "[w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances," and "[i]n a manner the director reasonably believes to be in the best interest of the corporation." N.C.G.S. § 55A-8-30(a). Special rules apply when a director enters into a conflict-of-interest transaction with the corporation. *See, e.g.*, *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *45 (N.C. Super. Ct. Sept. 26, 2017) ("Conflict-of-interest transactions between a corporation and its officers or directors have long been subject to special rules."); *Meiselman v. Meiselman*, 309 N.C. 279, 308, 307 S.E.2d 551, 568 (1983) ("The rule that requires an undivided and unselfish loyalty to the corporation demands that

there shall be no conflict between duty and self-interest." (quoting *Guth v. Loft, Inc.*, 23 Del. Ch. 255, 270, 5 A. 2d 503, 510 (1939)); *see also* Russel M. Robinson, II, *Robinson on North Carolina Corporation Law* § 15.01[1], at 15-3 (7th ed. 2019).

43. Section 55A, Article 8 provides certain safe harbors for conflict-of-interest transactions, one of which allows a conflict-of-interest transaction when it is approved by a majority of a disinterested board fully informed as to the material facts of the transaction, including the director's interest in it. N.C.G.S. § 55A-8-31(a)(1). The statute has been interpreted to authorize a board to ratify past transactions. *See* N.C.G.S. § 55A-8-31(a)(1); Robinson, *supra*, § 17.07[3], at 17-30 ("[A]n improper act or transaction that is the basis of a derivative claim can be cured retroactively[.]").

44. Section 47F-3-118(c) is specific to planned communities and provides:

> In addition to the limitations of Article 8 of Chapter 55A of the General Statutes, no financial payments, including payments made in the form of goods and services, may be made to any officer or member of the association's executive board or to a business, business associate, or relative of an officer or member of the executive board, except as expressly provided for in the bylaws or in payments for services or expenses paid on behalf of the association which are approved in advance by the executive board.

This section is titled "[a]ssociation records" and is found in Article 3 of North Carolina's Planned Community Act. *See id.*

45. Plaintiffs contend that this statute reflects a strong public policy against transactions between a director and a planned community except in very limited circumstances, prohibiting some transactions that would otherwise be allowable under Chapter 55, Article 8. (*See* Pls.' Br. 11.) Pursuant to this construction, Plaintiffs contend that a payment for a property interest, such as the challenged

easements, moratorium on dues, and the Lawrimore Tract purchase, could not be retroactively approved the Board if they were not contemplated by the POA's bylaws. Plaintiffs do not expressly address in their Motion whether a Board could retroactively approve a conflict-of-interest transaction that is otherwise allowable by a planned community's bylaws. As to the EH Services, Plaintiffs contend that although transactions in goods or services may be allowable, any payment prior to the Board's approval in January 2019 was improper, and as to payments thereafter, the record does not support any finding that the Board approved the EH Services contract after being fully informed as to Warren and Bath's conflict of interest through EH Services' parent Warren Point, Inc. (*See generally* Pls.' Br.)

46. The Court must give meaning to the statutory language that Section 47F-3-103 is "[i]n addition to the limitations in Article 8 of Chapter 55A." *See State v. Johnson*, 246 N.C. App. 139, 145, 783 S.E.2d 21, 26 (2016) ("Our Supreme Court has stated 'a statute should not be interpreted in a manner which would render any of its words superfluous.'" (quoting *State v. Coffey*, 336 N.C. 412, 417, 444 S.E.2d 431, 434 (1994)). "In matters of statutory construction, our primary task is to ensure that the purpose of the legislature, the legislative intent, is accomplished." *Electric Supply Co. v. Swain Electrical Co.*, 328 N.C. 651, 656, 403 S.E.2d 291, 294 (1991) (citing *Hunt v. Reinsurance Facility*, 302 N.C. 274, 288, 275 S.E.2d 399, 405 (1981)). "Where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning." *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209, 388 S.E.2d 134, 136 (1990),

and "a statute must be construed, if possible, so as to give effect to every provision," *id.* at 216, 388 S.E.2d at 140 (quoting *Jolly v. Wright*, 300 N.C. 83, 86, 265 S.E.2d 135, 139 (1980)).

47. Plaintiffs contend that the language means that the legislature intended to draw "a clear, bright-line rule" that disfavors transactions between a director and a planned community, (Pls.' Br. 11), and that "it is impossible to fit this transaction into these [statutory] requirements, (Pls.' Br. 13.) Defendants reject such a limited construction but have not themselves offered a cogent, persuasive argument as to how Section 47F-3-118(c) should not be read to impose limitations "in addition to" and therefore more restrictive than the provisions of Chapter 55A, Article 8.

48. The Court concludes that neither party has proposed an appropriate guiding principle that demands summary judgment in its favor. The Court cannot, as Defendants invite, simply disregard the limiting statutory language and uphold the Board's ratification of the property transactions where it can find no authority for the transactions in the POA's current bylaws. However, the Court is also not persuaded that the legislature intended to tie a planned community Board's hands so tightly as to preclude its ability to approve an interested-director transaction that clearly advances its interest, so long as it does so after being fully informed. Section 47F-3-118(c) does not prohibit such transactions outright. To the contrary, it expressly contemplates that such transactions may be approved by a planned community's bylaws.

49. Here, the POA's bylaws provide that the Board can amend them. (Bylaws.) Section 47F-3-118(c) is silent as to whether a Board can retroactively amend bylaws in order to achieve the equivalent of ratification pursuant to Section 55A-8-31.[5]

50. The Court notes that an overly strict bright-line rule could work against a planned community's interest by discouraging a director to take action in the face of an emergency—such as, for example, personally incurring expense or liability on the community's behalf in a weather-related emergency when any hope of repayment would be barred because exigent circumstances did not allow for advance board approval.

**(2) The Transactions**

51. The Court turns to its examination of the challenged transactions under both Section 55A-8-30 and Section 47F-3-118(c) with these considerations in mind.

**a. The Emergency Access Road**

52. The Court concludes that the evidence is clear that Warren was an interested party in this transaction. *See* N.C.G.S. § 55A-8-31(b). However, the evidence does not compel a finding that Bath was an interested party at the time the Board granted the moratorium on POA dues and purchased the easements related to

---

[5] The record does not reflect whether the Board was aware of Section 47F 3-118(c)'s limitation when it voted to ratify the property transactions involving Warren and Bath, or, if so, whether it considered amending the bylaws retroactively in order to approve the transactions. The POA's Bylaws provide that "[t]hese Bylaws may be altered, amended or repealed and new Bylaws may be adopted by a majority vote of the Board of Directors present at any regular or special meeting." (Bylaws.) The Court expresses no opinion on whether any such amendment could be applied retroactively and that issue is not presently before the Court.

Lot 52, as Bath's joining with Warren in the construction project involving Lot 52 did not occur until after the Board's decision had been made. (*See* Dep. Bath 34:15–35:23; Bd. Mins. Dec. 17, 2016; Right Way Agreement & Deed Easement; Bd. Mins. Mar. 4, 2017.)

53. The Court further concludes that the uncontested record demonstrates that the Board's approval of the transactions with Warren related to the emergency access road would satisfy the statutory safe harbor requirements of N.C.G.S. § 55A-8-31(a)(1). The Board was aware of Warren's interest and, specifically, that Warren owned both Lot 52 and the eighteen-acre tract when approving both the moratorium and the Easement Agreement. In particular, the Board knew that Lot 52 "was purchased at auction by Dana Warren[,]" (Bd. Mins. Dec. 17, 2016), and "the Board of Directors [was] aware that two of the tracts of land through which the road will pass [were] owner [sic] by [Warren][,]" (Bd. Mins. Mar. 4, 2017). A majority of board members voted to approve both the moratorium and the Easement Agreement, with Warren abstaining.[6] (Bd. Mins. Dec. 17, 2016; Bd. Mins. Mar. 4, 2017.)

54. The critical issue, then, is whether the transactions with Warren concerning Lot 52 are prohibited by Section 47F-3-118(c), which the Court has concluded imposes restrictions beyond those imposed by Chapter 55, Article 8. These

---

[6] The Court rejects Plaintiffs' contention that Wells' vote should not be considered for any transaction because she is married to Thomas who later became a member of FOBM. (*See* Pls.' Br. Supp. 15 n.6.) *See, e.g.*, *Geitner v. Mullins*, 182 N.C. App. 585, 591, 643 S.E.2d 435, 439 (2007) ("The General Assembly clearly and unequivocally did not define a director as having a conflict of interest solely based upon a familial relationship in N.C.[G.S.] § 55-8-31.") Plaintiffs have offered no other evidence that might support Wells being disqualified as an interested director.

transactions were not for "goods or services," even though the Board approved them in advance. However, the Court has been unable to discern any provision in the POA's bylaws that contemplated these transactions. While the Board attempted to ratify the transactions, it does not appear it did so by considering a retroactive amendment of the POA's bylaws.

55. The Court concludes that absent such an amendment, the transactions are not permitted by Section 47F-3-118(c).

### b. The Lawrimore Tract

56. In connection with the Lawrimore Tract, Plaintiffs contend that Defendants breached their fiduciary duties by "creat[ing] a private LLC[,]" "[r]ather than conducting business as the Board . . . to purchase additional greenspace," had a "personal financial interest" in the transaction, and "unilaterally withheld the most valuable piece of the Lawrimore Tract for their company and have attempted to profit off of it." (Pls.' Br. 14–15.) Defendants contend that the POA's purchase of the Lawrimore Tract was both approved by the Board before the purchase was closed and was ratified after the fact. (*See* Reply Pls.' Resp. Opp'n Defs.' Mot. Summ. J. 9, ECF No. 34.)

57. The Court first considers the transaction pursuant to Section 55-8-31 and concludes that there are unresolved questions of fact as to whether a disinterested board was fully informed before voting to approve the POA's purchase of its portion of the Lawrimore Tract.

58.     Both Warren and Bath had an interest in the transaction as members of FOBM.  *See* N.C.G.S. § 55A-8-31(b).  Warren disclosed his membership in FOBM to the Board; Bath did not.  (Dep. Warren II 29:17–30:16; Dep. Bath 92:9–21.)  At least some directors were aware that Warren and Bath were members of FOBM prior to voting on the purchase.  (Aff. Robert Ferguson ¶ 10; Aff. Bridget Wells ¶ 10; Dep. Pue-Gilchrist 52:12–19.)  But Warren was adamant that he did not disclose who the other members of FOBM were to protect them as future potential contributors for other matters benefiting the community.  (Dep. Warren II 30:13–31:22.)  Board records do not reflect any member's knowledge of Bath's membership in FOBM.  (*See* Bd. Mins. Jan. 20, 2018; Bd. Mins. Mar. 17, 2018.)

59.     Second, the record does not compel a finding that Board members voting to approve the transaction were fully informed either that FOBM withheld three acres of the tract or, if they were so informed, as to the relative value of those three acres to other portions of the tract.  (*See* Dep. Warren 107:20–09:2; Dep. Bath 104:4–23; Bd. Mins. Jan. 20, 2018.)  Furthermore, while Plaintiffs' allegations had been stated in detail in the complaint before the Board voted to ratify the transaction, the record does not demonstrate whether Board members voting to ratify had read the complaint or had been informed as to its content.  (*See* Resolution.)  Warren testified that FOBM "would have talked about" the fact that "only a parcel" of the twenty-three acres would go to the POA.  (Dep. Warren II 24:13–22), but Board minutes do not reflect such consideration.

60. As to the validity of the transaction pursuant to Section 47F-3-118(c), the Court again notes that it is unable to discern any provision of the POA's bylaws, in place at the time of the transaction or added thereafter, that authorizes this transaction.

61. In sum, the Court finds that contested material issues of fact preclude summary judgment in favor of any party as to this transaction.

### c. EH Services

62. The EH Services contract does involve a contract for services that an informed disinterested board could approve pursuant to Section 47F-3-118(c), so long as the approval was in advance of payment. The issue is whether an informed disinterested board voted to approve the payments to EH Services.

63. Invoices show that Harrison began doing work in December of 2017, (EH Services Invoice), but it was not invoiced until January 15, 2018, (POA Invoices). The record indicates that the POA's use of EH Services was presented to the Board in January 2018, and that the earliest date of potentially effective Board approval was January 20, 2018. (Aff. Bridget Wells ¶ 12; Aff. Pat Dale ¶ 17, ECF No. 30.7; Aff. Robert Ferguson ¶ 12.) It is not entirely clear, but it appears the first payment was likely after January 20, 2018.

64. However, the record does not compel a finding either that the Board actually voted to approve the contract or that the Board members were fully advised as to the interest that both Warren and Bath had in the transaction because of their interest in EH Services' parent Warren Point, Inc. The RPA, assuming it was

approved, discloses Warren's interest in EH Services but does not disclose that Bath now had an interest in Warren Point, Inc. through Defendants' Profit Sharing Agreement. Additionally, while two directors recall voting in favor of the transaction, there is no definitive evidence indicating that a contract with or payment to EH Services was ultimately approved by a majority of disinterested directors. (Aff. Bridget Wells ¶ 12; Aff. Pat Dale ¶ 17; *see* Dep. POA 106:11–18.) At least one director testified that she did not know that EH Services was owned by Warren, (Dep. Pue-Gilchrist at 111:16–112:12), and the record affords some uncertainty as to what Board members may have ultimately known of Bath's involvement with EH Services. (*See* Aff. Bridget Wells ¶ 12; Aff. Pat Dale ¶ 17; Dep. POA 106:11–18; Dep. Pue-Gilchrist at 111:16–112:12; RPA.)

65. These disputed material issues of fact preclude summary judgment for any party as to the EH Services contract.

### d. The Voluntary Paving Project

66. Plaintiffs have not challenged the Voluntary Paving Project as a conflict-of-interest transaction. (Pls.' Br. 9–10.) Instead, Plaintiffs claim that the $141,500 raised for the project was "well short of the total project cost" and that directors voting in favor of a $350,000 bank loan breached their fiduciary duty to the community. (Pls.' Br. 10.) Plaintiffs' specific attack is on Warren's having secured the bank loan pursuant to the POA's improper approval.

67. Plaintiffs have not made claims against all Board members. It is unclear how Plaintiffs expect to prove that individual liability should flow to Warren or Bath

where the loan is within the parameters expressly approved by the Board. The Court further notes that the business judgment rule presents a hurdle the Plaintiffs have not overcome.

68.     As stated in *Robinson on North Carolina Corporation Law*,

> [The business judgment rule] operates primarily as a rule of evidence or judicial review and creates, first, an initial evidentiary presumption that in making a decision the directors acted with due care (*i.e.*, on an informed basis) and in good faith in the honest belief that their action was in the best interest of the corporation, and second, absent rebuttal of the initial presumption, a powerful substantive presumption that a decision by a loyal and informed board will not be overturned by a court unless it cannot be attributed to any rational business purpose.

Robinson, *supra*, § 14.06, at 14-19.

69.     "A plaintiff may overcome the presumption with proof that [the directors] 'failed to act (1) in good faith, (2) in the honest belief that the action taken was in the best interest of the company or (3) on an informed basis.' " *Blythe v. Bell*, 2013 NCBC LEXIS 7, at *39 (N.C. Super. Ct. Feb. 4, 2013) (quoting *Technik v. WinWholesale Inc.*, 2012 NCBC LEXIS 5, at *32 (N.C. Super. Ct. Jan. 13, 2012)).

70.     Here, Plaintiffs have produced evidence that in 2017, the POA adopted the Voluntary Paving Project in response to member interest. (Voluntary Pavement Policy.)  The policy provided that "[t]he costs of preparing the surface for pavement . . . would be borne by the association." (Voluntary Pavement Policy.)  A group of POA members thereafter solicited donations from the community and raised approximately $141,500.00. (Dep. Pue-Gilchrist 93:12–95:24; Dep. POA 56:7–10.)

71.     Plaintiffs' own evidence is that the POA authorized Warren to procure a bank loan "to secure financing favorable to the association with maximum annual

payments not exceeding the budgeted annual road reserve contribution of $74,000 in road reserves and a term not exceeding six years." (Strategic Improvement Project.) Plaintiffs have provided the loan documents, indicating that the POA obtained a loan in July 2018 for a term less than six years with annual payments at $58,333.33. (Loan Agreement.)

72. The Court concludes that, as a matter of law, Plaintiffs' evidence is not adequate to overcome the initial presumption that protects both the Board and Warren acting at its direction. "To rebut th[e] [business judgment rule] presumption, a plaintiff must present 'more than bare allegations of breaches of fiduciary duties on the part of directors.'" *Maurer v. Maurer*, 2013 NCBC LEXIS 41, at *16 (N.C. Super. Ct. Aug. 23, 2013) (quoting *Wachovia Capital Partners*, 2007 NCBC LEXIS 7, at *23). "[T]he business judgment rule is 'process oriented' rather than a simple exercise of an after the fact 'objective' evaluation." *Id.* (quoting *State v. Custard*, 2010 NCBC LEXIS 9, at *57–58 (N.C. Super. Ct. Mar. 19, 2010)). The fact that Plaintiffs have a contrary view that the paving was too expensive does not support moving their claim forward.

73. The Court therefore concludes that summary judgment is proper for Defendants as to the Voluntary Paving Project.

**B.  Plaintiffs' Potential Remedies**

74. Defendants' Motion seeks summary judgment that Plaintiffs cannot recover damages on a claim for constructive fraud or for punitive damages. The Court determines that its further consideration of whether Plaintiffs are entitled to submit

an issue to the jury based on constructive fraud should be deferred until it determines whether Plaintiffs have first presented evidence adequate to support a finding of a breach of fiduciary duty. As to punitive damages, while it is not persuaded that the record will ultimately be adequate to withstand a motion for directed verdict, the Court defers its further consideration until Plaintiffs have presented to the fact finder their evidence as to liability in the first instance.

## VI. CONCLUSION

75. For the foregoing reasons, the Court DENIES the Motions as to all claims other than the Voluntary Pavement Project and GRANTS Defendants' Motion as to that claim.

IT IS SO ORDERED, this the 15th day of December, 2020.


/s/ James L. Gale
_____
James L. Gale
Senior Business Court Judge