Adum v. Albemarle Plantation Prop. Owners Ass'n, 2021 NCBC 4.

STATE OF NORTH CAROLINA

PERQUIMANS COUNTY

ELIZABETH ADUM, et. al.,

               Plaintiffs,

v.

ALBEMARLE PLANTATION
PROPERTY OWNERS
ASSOCIATION, INC., et. al.,

               Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 38

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS**

THIS MATTER comes before the Court on Defendants Albemarle Plantation Property Owners Association, Inc. ("APPOA"), et. al.'s[1] Motion to Dismiss Plaintiffs' First Amended Complaint. ("Motion to Dismiss," ECF No. 29.)

THE COURT, having considered the Motion, the briefs in support and in opposition to the Motion, arguments of counsel at the hearing, the applicable law, and other appropriate matters of record, CONCLUDES that the Motion should be GRANTED, in part, and DENIED, in part, for the reasons set forth below.

*Jordan Price Wall Gray Jones & Carlton, PLLC, by Lori P. Jones and Daniel Mullins for Plaintiffs*

*Ragsdale Liggett, PLLC, by William W. Pollock, Benjamin Kuhn, Jacqueline Y. Ferrel, Aretina K. Samuel-Priestley, and Charles M. Sims for Defendants.*

---

[1] The named Defendants also include the following alleged officers/directors of the APPOA: Nicholas A. Calabro, Robert C. Muir III, Charles J. Pencinger, Ormond L. Fortier, Travis W. Walsh, Anne Lankford, Anthony R. Edwards, James A. Ermi, Kathryn Tenenholz, Victor J. Galgano, Robert Masters.

McGuire, Judge.

1.      This matter arises out of APPOA's purchase of certain recreational amenities in the Albemarle Plantation (the "Plantation") residential community, and the property owners' objections to various amendments to the declaration of covenants regarding fees and assessments that were made in connection with the acquisition of the recreational amenities.

I.      FACTS AND PROCEDURAL BACKGROUND

2.      The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)"), but only recites those facts included in the complaint that are relevant to the Court's determination of the Motion to Dismiss. *See, e.g.*, *Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). The following facts are drawn from the Plaintiffs' First Amended Complaint and the documents attached thereto. ("Amended Complaint," ECF No. 22.)

3.      The Plantation is a residential community located in Perquimans County, North Carolina, comprised of over 1,000 lots of which approximately 450 are unimproved (vacant) lots, 490 are improved lots,[2] and 89 are deemed "developer lots" by the APPOA Board of Directors (the "Board"). (*Id.* at ¶¶ 1, 51.) Plaintiffs are owners of vacant lots in the Plantation, all of whom are also members of the APPOA. (*Id.* at ¶¶ 52–53.)

---

[2] "Improved" lots are those on which residences have been built.

4. The APPOA is a non-profit corporation formed in 1989 with its registered office and principal place of business in Perquimans County, North Carolina. (*Id*. at ¶ 45.) Defendants Nicholas Calabro, Robert Muir III, Charles Pencinger, Ormond Fortier, Travis Walsh, Anne Lankford, Anthony Edwards, James Ermi, Kathryn Tenenholz, Victor Galgano, and Robert Masters (collectively, the "Directors") are individuals who serve or served as directors and officers on the Board during the time periods relevant to this lawsuit. (*Id*. at ¶ 46.)

5. When the Plantation was created in 1989, the then-declarant, HPB Enterprises ("HPB"), recorded the Master Declaration of Covenants, Conditions and Restrictions for Albemarle Plantation ("Master Declaration"). (*Id*. at ¶ 54, Ex. A.) However, prior to HPB recording the Master Declaration, a portion of the Plantation was conveyed to Sound Golf Enterprises who would be constructing certain recreational amenities, including a golf course and associated club house, pro shop, driving range, swimming pool, and tennis courts (the "Recreational Amenities").[3] (*Id*. at ¶ 55.) Per the Master Declaration, no lot owner obtained "any right, title or interest, either equitable or legal, in any of the Recreational Amenities by reason of his purchase" of a lot in the Plantation.[4] (*Id*. at ¶ 59, Ex. A, p. 7.) Rather, the Recreational Amenities were business enterprises operating on a fee basis for the

---

[3] Neither HPB nor Sound Golf Enterprises are parties to this lawsuit.

[4] While conveyance of any lot in the Plantation under the Master Declaration did not convey any "right, title, or interest" in the Recreational Amenities, the Master Declaration did provide for a temporary "automatic membership" in the Recreational Amenities, the duration of which was set by the then-owner of the Recreational Amenities. (ECF No. 22, at ¶ 58, Ex. A, pp. 5–6.)

private use of the Plantation's lot owners, and therefore were "not a part of the Common Areas and facilities" of the Plantation. (*Id.* at ¶ 57.)

6. The Master Declaration required lot owners in the Plantation to pay annual assessments to fund common expenses. (*Id.* at ¶ 60.) The only other type of assessments provided for in the Master Declaration were special assessments that could be levied in a particular year, applicable to that year only, for the purpose of defraying the cost of any construction or reconstruction, unexpected repair or replacement of a capital improvement upon the Common Area, or for other purposes deemed appropriate by the APPOA.[5] (*Id.* at ¶ 62.) Any annual or special assessment paid to the APPOA did not include payments towards the Recreational Amenities. (*Id.* at ¶¶ 60, 62.)

A. **Amendment to the Master Declaration**

7. Article Eleven, Section 4 of the Master Declaration states that the Master Declaration runs with the land and is binding upon all persons claiming under it until December 31, 2009 and continues in full force thereafter until 60% of the owners agree to amend or terminate the Master Declaration. (*Id.* at ¶ 63.)

8. Article Eleven, Section 5 of the Master Declaration grants the declarant the authority to modify or amend the Master Declaration at any time up until turnover,[6] without prior notice, without the consent of owners, and for any purpose

---

[5] "Common area" means commonly held real property within the Plantation such as the roads, driveways, walkways, any right of ways reserved for the APPOA, open spaces (both landscaped and natural), lagoons, lakes and ponds. (ECF No. 22, at Ex. A, p. 3.)

[6] "Turnover" refers to turning over control of the APPOA from the declarant to the Board. (*Id.* at Ex. A, pp. 14–15.)

as long as the amendment does not materially alter the basic plan of development. (*Id*. at ¶ 64.) After turnover, the Board was granted the authority to amend the Master Declaration provided such amendment did not materially alter the basic plan of development. (*Id*. at ¶ 65.)

9. HPB made eight amendments to the Master Declaration prior to turnover. (*Id*. at ¶ 68.) The first eight amendments are not at issue in this lawsuit.

10. On June 30, 2009, HPB executed a special warranty deed to Albemarle Plantation Holdings LLC ("APH") conveying certain real property as well as HPB's development rights, including its rights as the developer and declarant under the Master Declaration.[7] APH, as subsequent declarant, was responsible for the remainder of the amendments to the Master Declaration—notably, for purposes of this lawsuit, the Tenth, Eleventh, Twelfth, Thirteenth, and Fifteenth Amendments. (*Id*. at ¶¶ 70, 74, 76–77, 80.)

i. *The Tenth, Eleventh, Twelfth, Thirteenth, and Fifteenth Amendments*

11. On April 13, 2011, APH recorded the Tenth Amendment to the Master Declaration, which changed, *inter alia*, various parameters regarding the assessments applicable to lots in the Plantation set forth in Article Five, Section 5 of the Master Declaration.[8] (*Id*. at ¶ 71, Ex. B.) Specifically, the Tenth Amendment

---

[7] APH is not a party to this lawsuit.

[8] Prior to the Tenth Amendment, Article Five, Section 5 of the Master Declaration provided that the annual assessment rate could be increased by the greater of 10% of the assessment for the previous year *or* by the percentage increase, if any, for the then current year in the Consumer Price Index ("CPI"). (ECF No. 22, at ¶ 61.) Further, the Master Declaration established a bifurcated assessment rate with owners of vacant lots paying 75% of the annual assessment rate charged to owners of improved lots. (*Id*. at ¶ 61.)

provided that (1) annual assessments could no longer be increased by 10% of the assessment for the previous year and could *only* be increased in proportion to the percentage increase, if any, of the CPI (*Id.* at ¶ 72); and (2) the assessment rate for vacant lots would be increased from 75% to 80% of the annual assessment for occupied lots (*Id.* at ¶ 73).

12. The Eleventh Amendment was recorded by APH on January 12, 2012. (*Id.* at ¶ 74.) Several "significant" changes were made in the Eleventh Amendment, which (a) required all votes, including votes on amendment of the Master Declaration or the right of the APPOA to obtain a loan to purchase any Recreational Amenity, to have a 50% vote of the members voting in person or by proxy; (b) referenced the idea that the Recreational Amenities, if acquired, would become part of the Common Areas of the APPOA; (c) stated that owners would become automatic members of the Recreational Amenities upon purchase of their lot, subject to paying initiation fees, dues, and other applicable fees; (d) added "marketing and maintaining the development and improvements therein" to the purpose of assessments; (e) added the acquisition of the Recreational Amenities as a purpose for special assessments; (f) granted the Board the authority to purchase the Recreational Amenities with approval of 50% of the members, and to apportion a special assessments differently between various categories of members; (g) provided that after December 31, 2009, the Master Declaration could be amended by a vote of a majority of the members; (h) exempted certain entities from having to pay annual or special assessments to the APPOA, including APH, the entity Albemarle Plantation Holdings II, LLC ("APH II"),

and any party who acquired a total of forty or more "Phase I" lots from APH or APH II, or who purchased the "Cole Tract" for development; and (i) provided that at the time any lot or house was sold by APH or APH II in Phase I, the purchaser would be required to pay to the APPOA a mandatory social initiation fee in an amount not to exceed $2,500, except for those purchasing five (5) or more lots who would not have to pay said fee. (*Id.* at ¶ 75.)

13. On January 13, 2012, APH recorded the Twelfth Amendment to the Master Declaration which stated, *inter alia*, that the Board has the authority to amend the Declaration, but not until after the first APPOA meeting following turnover. (*Id.* at ¶ 76, Ex. D.)

14. On February 10, 2012, APH recorded the Thirteenth Amendment to the Master Declaration which stated, *inter alia*, that neither APH, APH II, nor any party acquiring forty (40) or more Phase I lots from APH or APH II or who purchased the "Cole Tract" or "Matthews Tract" would be required to pay annual or special assessments on any lots owned within Phase I. (*Id.* at ¶¶ 77–78, Ex. E.) APH also reserved the right for itself and any "Subsequent Developer" to submit the Cole Tract or Matthews Tract to the Master Declaration and to make the same part of the Plantation. (*Id.*)

15. On February 21, 2012, APH recorded the Fifteenth Amendment to the Master Declaration which stated, *inter alia*,

> the Board of Directors of the Association may, in their sole discretion, impose reasonable social dues to the Owner of any property, and such social dues may differ in amounts depending on whether it is an unimproved Lot or has a

dwelling on it. The Board of Directors in its reasonable discretion, may also modify the assessment of social dues to Owners of multiple properties.

(*Id.* at ¶¶ 81–80, Ex. F.) The Fifteenth Amendment also discussed categories of assessments for Recreational Amenities and the imposition of a special assessment—the "Recreational Assessment"—that could be imposed to purchase the Recreational Amenities. (*Id.* at ¶ 82.)

*ii.    The Amended and Restated Declaration*

16.    On February 13, 2013, APH recorded the Amended and Restated Declaration, which was also purportedly approved and recorded by the Board but was not approved by a vote of the members of the APPOA. (*Id.* at ¶¶ 83–85, Ex. G.) The purpose of the Amended and Restated Declaration was to incorporate all changes made by the prior amendments except for the Ninth Amendment, and "to make additional non-material changes" to the Master Declaration "to reflect that Declarant has made turnover to APPOA,[9] and has conveyed substantially all of the Common Areas and all of the Recreational Amenities to APPOA[.]" (*Id.* at ¶ 86.)

17.    Article Two, Section 1 of the Amended and Restated Declaration reflects the APPOA's purchase of the Recreational Amenities. (*Id.* at ¶ 87.) Owners of both improved and vacant lots were required to pay a $2,200 special assessment to support the purchase. (*Id.* at ¶ 90.) Owners of improved lots paid an additional $660 as an "amenities assessment" and $840 for "operating reserves." (*Id.* at ¶ 91.) Owners of vacant lots were not required to pay the amenities assessment or operating reserves

---

[9] The First Amended Complaint does not allege the specific date upon which turnover occurred.

at that time, but instead, payment was deferred until the lot was built upon. (*Id.* at ¶ 91.) When a property was sold, the owner-seller would be reimbursed for the base special assessment and amenities assessment, but the buyer would then be assessed those amounts. (*Id.* at ¶ 92.)

## B. Entities Subsidized by the APPOA

18. Albemarle Plantation Properties, Inc. ("APPI") is a North Carolina for-profit corporation, formed in conjunction with the APPOA's purchase of the Recreational Amenities to manage and operate the Recreational Amenities. (*Id.* at ¶ 94.) APPI is a wholly owned subsidiary of the APPOA. (*Id.* at ¶ 95.) APPI is subsidized by the APPOA from assessments collected from lot owners. (*Id.* at ¶ 96–97.)

19. AP Realty Company, LLC ("APR") is a for-profit North Carolina limited liability company engaged in the brokerage of resale properties within the Plantation and is wholly owned by the APPOA. (*Id.* at ¶ 99.) APR is subsidized by the APPOA from assessments collected from lot owners. (*Id.* at ¶ 100.) Of the funds collected, a substantial amount is allocated for marketing, which has largely been focused on developer projects. (*Id.* at ¶¶ 101–104.) If vacant lot owners desire to list their property with APR, they are not permitted to list their lots below assessed tax value, which inhibits vacant lot sales as many lots are essentially worth less than tax value, especially in light of the various required fees and assessments for lot owners in the Plantation. (*Id.* at ¶ 108.) In effect, vacant lot owners are discouraged if not

prohibited from utilizing the services of APR, an entity their assessments are used to support. (*Id*. at ¶ 109.)

**C.    Various    Board    Actions    Regarding    APPOA    Expenditures, Assessments and Fees, and Elections**

20.    Plaintiffs contend that the Board has taken actions that favor developers and owners of improved lots in the Plantation to the disadvantage of Plaintiffs. The APPOA has a large annual marketing budget that is funded through annual assessments. Plaintiffs appear to contend that the APPOA's marketing expenditures benefit developers trying to sell vacant lots but do not benefit Plaintiffs who are current owners of unimproved lots. (*Id*. at ¶¶ 101–22, 134–37.)

21.    Plaintiffs further allege as follows:

> 125.    In    addition,    the    Master    Declaration    was impermissibly amended to essentially create a new assessment for the purchase of the Recreational Amenities, even though the Master Declaration from the outset was very clear that the Recreational Amenities would be owned by third parties and would not be part of the common areas.

> 126.    Following purchase of the Recreational Amenities, social fees have been imposed on existing owners, even though such fees were never contemplated. Upon information and belief, the mandatory social fee for 2020 is $2,220 per year.

(*Id*. at ¶¶ 125–26.)

22.    As a result of the Board's actions, Plaintiffs allege:

> [s]ome Plaintiffs have tried to sell their vacant lots from anywhere between $100 and $1,000. However, because of the fees levied by the Association, buyers have indicated they are not interested. Some Plaintiffs have even tried to give their lots away and been unsuccessful due to the unreasonable fees.

(*Id*. at ¶ 133.)  Plaintiffs further allege:

> the Board has impermissibly increased fees, assessments, and other monetary obligations. With the depressed value of vacant lots, the reality is that there is essentially no likelihood of sale of most of Plaintiffs' lots, as no investor would be willing to pay the type of fees required at closing, and thereafter in assessments, given the value of the lots.

(*Id*. at ¶ 142.)

23.    Finally, Plaintiffs allege that the Board has also taken steps to disenfranchise Plaintiffs and others at the Plantation with respect to service on the Board.  (*Id*. at ¶ 138.)  In 2019, the Board enacted a document titled "APPOA Election Process – 2019" which prevents persons currently in the process of selling his or her property in the Plantation from serving on the Board.  (*Id*. at ¶ 139.)  Additionally, the Board enacted "Campaigning Rules" which purport to prohibit a candidate from campaigning for any other candidate.  (*Id*. at ¶ 140.)

24.    On various occasions, Plaintiffs made complaints to the Board, including writing blog posts, of which the Board was aware since at least February 2017, and were commented on by then President of the Board, Nick Calabro.  (*Id*. at ¶145.)  Further, in August 2017, Plaintiffs submitted questions during a webinar led by the Board regarding misuse of assessments, marketing and security, vacant lot owner fees, subsidy by lot owners of APR, and APR as a viable enterprise.  The Board ignored the Plaintiffs questions.  (*Id*. at ¶ 146.)  On June 7, 2018, certain Plaintiffs sent a letter to the Board specifically complaining about the initiation fees.  (*Id*. at ¶

147.)  Despite these complaints, the Board has refused to make any meaningful changes to address Plaintiffs' concerns.  (*Id*. at ¶ 148.)

## II.    PROCEDURAL HISTORY

26.    Plaintiffs filed the Complaint on February 27, 2020.  (ECF No. 3.)  On April 8, 2020, the matter was designated a mandatory complex business case, and assigned to the undersigned.  (Desig. Ord., ECF No. 1; Assign. Ord., ECF No. 2.)  On June 18, 2020, Plaintiffs filed the Amended Complaint.

26.    The Amended Complaint, alleges two causes of action: the first for declaratory judgment, seeking fourteen (14) declarations from the Court regarding the rights of the parties with respect to the Master Declaration, the various amendments thereto, and resolutions of the Board; the second for breach of fiduciary duty, alleging both individually and derivatively five breaches with respect to the individual Defendants' duties as directors and officers of the APPOA.  (*Id*. at ¶¶ 153–154, 158.)[10]

27.    On August 3, 2020, Defendants filed the Motion to Dismiss, accompanied by a Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint.  ("Brief in Support," ECF No. 30.)  Plaintiffs subsequently filed their Memorandum of Law in Opposition to Defendants' Motion to

---

[10] The Amended Complaint creates some confusion regarding whether Plaintiffs are attempting to allege the claim for declaratory judgment both individually and derivatively. In the unnumbered introductory paragraph, Plaintiffs allege that they bring the claims "in their individual capacities and derivatively as members of the" APPOA. (*Id*. at p. 4.) However, they do not specifically allege in the first count whether they bring the claim individually or derivatively (or both). (*Id*. at ¶¶ 149–54.) On the other hand, in the second count for breach of fiduciary duty, Plaintiffs specifically allege that "Plaintiffs bring this claim individually and derivatively on behalf of the [APPOA]." (*Id*. at ¶ 161.)

Dismiss Plaintiffs' First Amended Complaint ("Brief in Opposition," ECF No. 34), and Defendants filed a Reply Brief in Support of their Motion to Dismiss Plaintiffs' First Amended Complaint ("Reply Brief," ECF No. 35). The Court held a hearing on the Motion to Dismiss on October 15, 2020, and it is now ripe for decision.

## III. LEGAL STANDARD

28. Defendants move for dismissal under North Carolina Rule 12(b)(7) of Count I for failure to join all necessary and indispensable parties to this litigation. (ECF No. 29, at ¶ 1.) Defendants' move for Rule 12(b)(6) dismissal of Counts I and II for not being timely filed within the applicable statute of limitations; and Count II for lack of standing and failure to sufficiently allege a claim for breach of fiduciary duty. (*Id.* at ¶¶ 2–6.)

### A. Rule 12(b)(6)

29. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). North Carolina is a notice pleading state. *See Feltman v. City of Wilson*, 238 N.C. App. 246, 252, 767 S.E.2d 615, 620 (2014) ("Under notice pleading, a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of res judicata, and to show the type of case

brought.") (quoting *Wake Cty. v. Hotels.com, L.P.*, 235 N.C. App. 633, 647, 762 S.E.2d 477, 486 (2014)).

30.   "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.'" *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736–37 (2018) (quoting *Wood v. Guilford County*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)).

31.   In deciding a Rule 12(b)(6) motion to dismiss, the court construes the complaint liberally and accepts all allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).  However, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (citation and quotation marks omitted).

32.   In addition, when considering a Rule 12(b)(6) motion to dismiss, "a court may properly consider only evidence contained in or asserted in the pleadings." *Jacobs v. Royal Ins. Co. of Am.*, 128 N.C. App. 528, 530, 495 S.E.2d 185, 187 (1998). However, where the complaint specifically refers to and depends on certain documents, "the Court may consider those documents without converting the motion into one for summary judgment under Rule 56 even if presented by the defendant."

*Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at *11 (N.C. Super. Ct. July 12, 2017).

### i. Statute of Limitations

33. "A motion to dismiss under Rule 12(b)(6) is an appropriate method of determining whether the statutes of limitation bar plaintiff's claims if the bar is disclosed in the Complaint." *Carlisle v. Keith*, 169 N.C. App. 674, 681, 614 S.E.2d 542, 547 (2005) (quoting *Hooper v. Liberty Mut. Ins. Co.*, 84 N.C. App. 549, 551, 353 S.E.2d 248, 250 (1987)). "[O]nce a defendant raises the affirmative defense of the statute of limitations, the burden shifts to the plaintiffs to show their action was filed within the prescribed period." *Lester v. Francis*, 199 N.C. App. 572, 576, 681 S.E.2d 858, 861 (2009) (citations omitted).

34. In a claim for declaratory judgment, "where [the] plaintiffs' underlying claims are barred by [the] statute of limitations, the Declaratory Judgment Act will not allow relief[.]" *Asheville Lakeview Props., LLC v. Lake View Park Comm'n, Inc.*, 254 N.C. App. 348, 349, 803 S.E.2d 632, 634 (2017).

### ii. Standing

35. In addition, a Rule 12(b)(6) motion to dismiss is also an appropriate method of determining whether a plaintiff has standing to bring its claims. *Finley v. Brown*, 2017 NCBC LEXIS 78, at *15 (N.C. Super. Ct. Sept. 1, 2017) ("[S]tanding arguments can be presented under both Rule 12(b)(1) and Rule 12(b)(6) arguments." (quoting *Sykes v. Health Solutions, Inc.*, 2013 NCBC LEXIS 52, at *8 (N.C. Super. Ct. Dec. 5, 2013)).

36.    "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction." *Finkel v. Palm Park, Inc.*, 2018 NCBC LEXIS 112, at *8 (N.C. Super. Ct. Oct. 24, 2018) (quoting *Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113, 574 S.E.2d 48, 51 (2002) (citations and quotation marks omitted)).  "Standing refers to whether a party has a sufficient stake in an otherwise justiciable controversy so as to properly seek adjudication of the matter." *Id.* (quoting *Woodring v. Swieter*, 180 N.C. App. 362, 366, 637 S.E.2d 269, 274 (2006) (internal quotation marks omitted) (citation omitted)); *Neuse River*, 155 N.C. App. at 114, 574 S.E.2d at 52 (referring to standing as "a party's right to have a court decide the merits of the dispute").  "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." N.C.G.S. §1A-1, Rule 12(h) (2020).

## B.    Rule 12(b)(7)

37.    In ruling on a motion to dismiss pursuant to Rule 12(b)(7), the Court's inquiry is whether plaintiffs have "[f]ail[ed] to join a necessary party." N.C.G.S. § 1A-1, Rule 12(b)(7).  A necessary party is one that is "united in interest" and is "so vitally interested in the controversy that a valid judgment cannot be rendered in the action completely and finally determining the controversy without his presence . . . ." *Strickland v. Hughes,* 273 N.C. 481, 485, 160 S.E.2d 313,316 (1968).  Any determinative judgment entered in the absence of a party united in interest, or a necessary party, is null and void. *Rice v. Randolph*, 96 N.C. App. 112, 113, 384 S.E.2d 295 (1989).

38.     "A party is not a necessary party simply because a pending action might have some impact on the party's rights, or otherwise affect the party." *Cape Hatteras Elec. Mbrshp. Corp. v. Stevenson*, 2014 NCBC LEXIS 64, at *4–5 (N.C. Super. Ct. Dec. 8, 2014). A party with an interest that "may be affected by a decree" but whose "presence is not essential in order for the court to adjudicate the rights of others," is a "proper" party, but not a necessary party. *Wallach v. Linville Owners* Ass'n, 234 N.C. App. 632, 637, 760 S.E.2d 23, 26 (2014). Unlike necessary parties, a proper party may, but is not required to, be joined. *Crosrol Carding Devs., Inc. v. Gunter & Cooke, Inc.*, 12 N.C. App. 448, 452, 183 S.E.2d 834, 837 (1971). "Whether a proper party will be ordered joined rests with the sound discretion of the trial court." *Id.* (citation omitted).

39.     Dismissal under Rule 12(b)(7) is proper only when the defect cannot be cured. *Howell v. Fisher*, 49 N.C. App. 488, 491, 272 S.E.2d 19, 22, *cert. denied*, 302 N.C. 218, 277 S.E.2d 69 (1981). "A dismissal under [Rule] 12(b)(7) is not considered to be on the merits and is without prejudice." *Crosrol*, 12 N.C. App. at 453–54, 183 S.E.2d at 838.

IV.     ANALYSIS

A.     **Count I – Declaratory Judgment**

40.     Plaintiffs request the Court "enter a declaratory judgment declaring the rights of the parties with respect to the Master Declaration, as amended, as well as resolutions of the Board[.]" (ECF No. 22, at ¶ 153.) Specifically, Plaintiffs request the Court declare as follows:

a. That the annual assessment rate for vacant lots is 75% of the annual assessment rate of improved lots, consistent with the language of the original Master Declaration, and that any amendment to the contrary is void and of no effect.

b. That the annual assessment may only be increased by up to 10% each year, or in the alternative in accordance with the CPI, that any greater increases require membership approval, and any amendment to the contrary is void and of no effect.

c. That the imposition of social fees or social dues is invalid and any amendment requiring payment of a social fee is void and of no effect.

d. That the new member initiation fee of $5,000 is invalid.

e. That any recreational assessment is invalid.

f. That annual and special assessments cannot be utilized to support the Recreational Amenities, including reserves for the same, and any amendment to the contrary is void and of no effect.

g. That annual and special assessments cannot be utilized to support APR, and any amendment to the contrary is void and of no effect.

h. That annual and special assessments cannot be utilized to support APPI, and any amendment to the contrary is void and of no effect.

i. That the Amended and Restated Master Declaration is void and of no effect.

j. That the Master Declaration does not authorize the type of marketing expenditures taken by the Association, and any amendment to the contrary is void and of no effect.

k. That owners of all lots subject to the Master Declaration are obligated to pay annual and special assessments to the Association.

l. That owners who are in the midst of selling their property are still eligible to serve on the Board of Directors.

m. That candidates running to serve on the Board or who are on the Board can campaign for other candidates.

(*Id.* at ¶ 153.) Further, Plaintiffs "request declaratory relief that the Master Declaration may only be amended with the approval of lot owners holding at least 67% of the votes in the Association, per the requirements of the Planned Community Act ("PCA"), and that any amendment to the contrary is void and of no effect." (*Id.* at ¶ 154.)

41. Defendants argue that (i) Plaintiffs' declaratory judgment claim should be stayed or dismissed pursuant to Rule 12(b)(7) for failure to join necessary parties, and (ii), that the declaratory judgment should be dismissed pursuant to Rule 12(b)(6) for failure to bring the claim within the applicable statute of limitations. The Court will address these arguments in turn.

*i.     Rule 12(b)(7) Motion*

42. Plaintiffs consist of only a portion of the Plantation's property owners— specifically, certain owners of vacant lots. Defendants contend that the requested declaratory judgment regarding the validity and interpretation of restrictive covenants would significantly impact the property rights of *all* the Plantation's property owners *and* the Declarant. (ECF No. 30, at p. 7.) Thus, relying on *Karner v. Roy White Flowers, Inc.*, 351 N.C. 433, 527 S.E.2d 40 (2000), Defendants argue that *all* the Plantation owners *as well as* the declarant are necessary parties to this

litigation, and the declaratory judgment claim should therefore be stayed until all necessary parties are joined, or otherwise should be dismissed. (ECF No. 29, at ¶ 1; ECF No. 30, at p. 7.) Plaintiffs argue that the unnamed lot owners and the declarant are not at risk of losing any valuable property right, and therefore are not necessary parties but only proper parties. (ECF No. 34, at pp. 6–8.)

43. In *Karner*, our Supreme Court held that nonparty property owners who "each . . . [had] the right to enforce [a] residential restriction against any other property owner seeking to violate [the] covenant" were necessary parties to a suit against certain neighbor defendants who planned to construct a commercial building in a residential area. 351 N.C. at 439, 527 S.E.2d at 44. The Court explained that "[t]he placement of the same restrictive covenant in all of the deeds conveying lots out of a subdivision according to a common plan of development" affords each property owner the right to "enforce the restriction against any other [property owner] governed by the common plan of development." *Id.* at 436–37, 527 S.E.2d at 42–43 (citing *Hawthorne v. Realty Syndicate, Inc.*, 300 N.C. 660, 665, 268 S.E.2d 494, 497, *reh'g denied*, 301 N.C. 107, 273 S.E.2d 442 (1980)). The Court noted that "[a]n adjudication that extinguishes property rights without giving the property owner an opportunity to be heard cannot yield a valid judgment." *Id.*

44. However, in *Midsouth Golf, LLC v. Fairfield Harbourside Condo. Ass'n, Inc.*, our Court of Appeals distinguished *Karner* and refused to extend its holding to a case involving a dispute over a set of restrictive covenants pertaining to amenity fees, which could *only* be enforced by "the owner of the recreational amenities." 187

N.C. App. 22, 29–30, 652 S.E.2d 378, 383 (2007). The court reasoned that "unlike in *Karner* . . . [n]one of the property owners . . . have the right to enforce the covenant to pay amenity fees against any of the other owners," and therefore extinguishment of the restrictive covenant would not deprive nonparties of "any property right akin to the right that the nonparty property owners were deprived of in *Karner*." *Id.*, 652 S.E.2d at 384.

45.     Similarly, in *Wallach v. Linville Owners Ass'n*, the Court of Appeals again distinguished *Karner* in an action fairly similar to the case at bar. *See* 234 N.C. App. 632, 760 S.E.2d 23 (2014). In *Wallach*, vacant lot owners in a planned subdivision commenced an action seeking a declaratory judgment that certain amendments to the declaration—particularly those regarding annual assessments— were invalid and unenforceable. *Id.* at 634, 760 S.E.2d at 25. Certain property owners within the planned subdivision were not joined. *Id.* Relying on *Midsouth Golf*, the Court of Appeals held that the action involving the amendments at issue "did not extinguish any property rights of the [nonparty property owners] akin to those in *Karner*" and therefore, the nonparty property owners were not necessary parties to the litigation. *Id.* at 639, 760 S.E.2d at 27–28.

46.     This matter is distinguishable from the holding in *Karner* for the same reasons as applied by the Court of Appeals to the facts of *Midsouth Golf* and *Wallach*. Here, the non-party property owners of the Plantation and the Declarant do not have the ability to *enforce* any provisions of the original Master Declaration or the Amended and Restated Master Declaration. Rather, Article Eleven, Section 7 of the

Amended and Restated Master Declaration states: "[f]ailure . . . to comply with a provision of this Master Declaration . . . shall provide the *Association* with the right to levy a fine and/or bring legal action at law or in equity[.]"[11]  (*Id.* at Ex. G, p. 38 (emphasis added).)  Thus, while the original Master Declaration and the Amended and Restated Master Declaration undoubtedly provide certain benefits to the non-party property owners and the declarant, they do not provide any of the non-party property owners or the declarant with the right to *enforce* any restrictive covenant against another owner.  Accordingly, while a finding by this Court that certain provisions of the original Master Declaration or the Amended and Restated Master Declaration are void and unenforceable would, in some sense, affect the rights of non-party property owners and the declarant, it would not deprive them of any property right akin to the right recognized in *Karner* and *Midsouth Golf*.  Therefore, in the Court's view, the non-party property owners and declarant are, at best, proper parties who may attempt to intervene if they choose to do so, subject to the Court's discretion.  Defendants' Motion to Dismiss pursuant to Rule 12(b)(7) should be DENIED.

### ii.     *Rule 12(b)(6) Motion – Statute of Limitations*

47.    Defendants argue that Plaintiffs' declaratory judgment action should be dismissed because the underlying claims are barred by the six-year statute of limitations applicable to enforcement of restrictive covenants.  (ECF No. 30, at pp. 10–12 (citing N.C.G.S. § 1-50(a)(3)).)  Defendants contend that at issue are the

---

[11] Similarly, Article Eleven, Section 7 of the original Master Declaration states: "Failure . . . to comply with a provision of this Master Declaration . . . shall provide the Association with the right to bring legal action at law or in equity[.]"  (ECF No. 22, at Ex. A, p. 37.)

Eleventh through Thirteenth and Fifteenth Amendments, as well as the Amended and Restated Declaration which incorporates those Amendments, the latest of which was recorded on February 13, 2013. Thus, Defendants argue that the latest Plaintiffs could have timely initiated this action was February 13, 2019, but the Complaint was not filed until February 27, 2020. (*Id.* at p. 11.)

48.     Plaintiffs do not dispute that restrictive covenants are at issue; however, Plaintiffs argue that they are seeking "interpretation" rather than "enforcement" of restrictive covenants, and therefore the underlying claims to their declaratory judgment action should not be subject to a six-year statute of limitations. (ECF No. 34, at p. 9.) In support of this contention, Plaintiffs cite *Allen v. Sea Gate Ass'n*, 119 N.C. App. 761, 460 S.E.2d 197 (1995). In *Allen*—an action brought in 1992—the Court of Appeals affirmed the trial court's ruling on summary judgment that certain "dues assessment and enforcement provisions" in a 1972 declaration to a residential subdivision were void and unenforceable. 119 N.C. App. at 764, 460 S.E.2d at 199. Thus, Plaintiffs contend that *Allen* demonstrates this Court's ability to assess the *validity* of restrictive covenants recorded well beyond section 1-50(a)(3)'s six-year statutory period.

49.     The Court is not persuaded by Plaintiffs' argument. None of Plaintiffs' underlying claims in its declaratory judgment action are seeking "interpretation." *Allen* falls within the line of cases where the court has invalidated unclear and ambiguous restrictive covenants—*i.e.*, covenants which are not "sufficiently definite" as to "assist courts in [their] application"—as well as provisions which are violative

of public policy. *See id.* at 764–765, 460 S.E.2d at 199–200; *see e.g., Wein II, LLC v. Porter*, 198 N.C. App. 472, 683 S.E.2d 707 (2009) (affirming a trial court's 2007 determination that certain restrictive covenants implemented in 1995 were "void for vagueness in fact" and "violate public policy"). Here, most of the underlying claims in Plaintiffs' declaratory judgment action, in effect, request the Court to *enforce* restrictive covenants in either the Master Declaration or the Amended and Restated Declaration. Only two underlying claims—Paragraphs 153(i) and 154—are arguably not enforcement actions, and the Court is not provided much guidance from Plaintiffs or Defendants as to the nature of these claims. Accordingly, the Court will assess each underlying claim, or group of underlying claims, in Paragraphs 153(a)–(h) and (j)–(m) as actions to enforce restrictive covenants subject to section 1-50(a)(3), and will address the underlying claims in Paragraphs 153(i) and 154 separately.

### a. Paragraphs 153(a)–(h) and (j)–(m)

50. The statute of limitations for *enforcing* a restrictive covenant is six years. *See* N.C.G.S. § 1-50(a)(3) (stating the statute of limitations for "injury to any incorporeal hereditament" is six years); *Hawthorne v. Realty Syndicate Inc.*, 43 N.C. App. 436, 440, 259 S.E.2d 591, 593 (1979), *aff'd*, 300 N.C. 660, 268 S.E.2d 494, *reh'g denied*, 301 N.C. 107, 273 S.E.2d 443 (1980) (stating that a restrictive covenant is, effectively, a "servitude" or "negative easement," and an "easement" is an "incorporeal hereditament"); *Irby v. Freese*, 206 N.C. App. 503, 511, 696 S.E.2d 889, 894 (2010) (applying a six-year statute of limitations pursuant to section 1-50(a)(3) in an action against defendant neighboring landowners to enforce restrictive covenants). The

statute of limitations for a claim under section 1-50(a)(3) "runs from the time that the claim accrues, even if a plaintiff is not aware of the injury at that time." *Duke Energy Carolinas, LLC v. Gray*, 237 N.C. App. 420, 426, 766 S.E.2d 354, 358–59 (2014) (holding that prior precedent in *Karner*, 134 N.C. App. 645, 518 S.E.2d 563, which addressed when the limitations period begins to run for a claim under section 1-50(a)(3), "does not require a holding that the statute of limitations runs from when plaintiff knew or reasonably should have known of the encroachment").

51.  Here, Paragraph 153(a) of the Amended Complaint asks that the Court enforce Article Five, Section 5 of the Master Declaration, which sets the annual assessment rate for vacant lots at 75% of the rate applicable to improved lots (ECF No. 22, at ¶ 73, Ex. A, p. 17), and, accordingly, declare void the increase of this rate to 80% in the Tenth Amendment and in Article Four, Section 5 of the Amended and Restated Master Declaration.  (*Id.* at Ex. B, p. 2, Ex. G, p. 19).  *See supra* ¶ 40(a).  Accordingly, the six-year statute of limitations on this claim began to run when the Tenth Amendment was recorded on April 13, 2011, and at the latest when the Amended and Restated Master Declaration was recorded on February 13, 2013, and the claim is untimely.  (ECF No. 22, at ¶ 70.)

52.  Paragraph 153(b) asks the Court to enforce Article Five, Section 5 of the Master Declaration,[12] and, accordingly, declare void the contrary provisions of the Tenth Amendment and Article Four, Section 5 of the Amended and Restated Master

---

[12] Article Five, Section 5 of the Master Declaration allows for any increase to the annual assessments to be calculated by "the greater of either 10% of the assessment for the previous year *or* by the percentage increase, if any, for the then current year in the Consumer Price Index." (ECF No. 22, at ¶ 72, Ex. A, p. 17 (emphasis added).)

Declaration which no longer allow the option for assessments to be increased by 10% of the prior year's assessment (*Id.* at Ex. B, p. 2, Ex. G, p. 19). *See supra* ¶ 40(b). Accordingly, the six-year statute of limitations on this claim began to run when the Tenth Amendment was recorded on April 13, 2011, and at the latest on February 13, 2013, and the claim is untimely.

53. Paragraphs 153(c), (e), (f), and (h) ask the Court to enforce Article Two, Section 5 and Article Five of the Master Declaration, which do not require any payment of fees or assessments for the Recreational Amenities (ECF No. 22, at Ex. A, pp. 7–8, 15–20), and, accordingly, declare void the Eleventh Amendment and provisions in Article Five of the Amended and Restated Declaration which allow for imposition of such assessments and social fees or dues (*Id.* at Ex. C, p. 2, Ex. G, pp. 18–24). *See supra* ¶¶ 40(c), (e), (f), and (h). Accordingly, the six-year statute of limitations on these claims began to run when the Eleventh Amendment was recorded on January 12, 2012, and at the latest on February 13, 2013, and the claims are untimely.

54. Paragraph 153(d) asks the Court to enforce Article Five of the Master Declaration *or* Article Five of the Amended and Restated Declaration (ECF No. 22, at Ex. A, pp. 15–20, Ex. G, pp. 18–24), which makes no mention of a new member initiation fee and, accordingly, declare invalid the Board resolution on November 17, 2016 which sets a new member initiation fee of $5,000 (*Id.* at ¶ 128). *See supra* ¶ 40(d). Accordingly, the six-year statute of limitations on this claim began to run on November 17, 2016, and the claim is timely.

55.     Paragraphs 153(g) and (j) ask the Court to enforce Article Five, Section 3 of the Master Declaration regarding the "purpose of assessments" (ECF No. 22, at Ex. A, pp. 16–17), which does not include any use of such assessments for marketing and, accordingly, declare that the contrary provisions in the Eleventh Amendment and Article Five, Section 3 of the Amended and Restated Declaration which allow for assessments to be levied for common expenses including marketing are void (*Id.* at Ex. C, p. 3, Ex. G, pp. 18–19).[13]  Accordingly, the six-year statute of limitations on these claims began to run when the Eleventh Amendment was recorded on January 12, 2012, and at the latest on February 13, 2013, and the claims are untimely.

56.     Paragraph 153(k) asks the Court to enforce the assessment provisions in Article Five of the Master Declaration requiring all lots to pay assessments and, accordingly, declare that the Eleventh Amendment and Article Three, Section 13 of the Amended and Restated Declaration, which allow certain properties to be exempt from paying any assessments (*Id.* at Ex. C, pp. 7–8, Ex. G, p. 14) are invalid.  *See supra* ¶ 40(k).  Therefore, the six-year statute of limitations on this claim began to run when the Eleventh Amendment was recorded on January 12, 2012, and at the latest on February 13, 2013, and the claim is untimely.

57.     Paragraphs 153(l) and (m) ask the Court to declare invalid the "APPOA Election Process – 2019" and "Campaigning Rules" adopted by the Board in 2019. (ECF No. 22, at ¶¶ 139–40; ECF No. 34, at p. 10.)  Accordingly, the six-year statute

---

[13] Paragraph (g) refers to "special assessments . . . utilized to support APR."  (ECF No. 22, at ¶ 153(g).)  APR "is engaged in the brokerage of resale properties within Albemarle Plantation."  (*Id.* at ¶ 99.)

of limitations began to run upon the actions of the Board in 2019, and the claims are timely.

58.    The present action was filed on February 27, 2020.  Therefore, the Motion to Dismiss the declarations sought in paragraphs (a)–(c), (e)–(h), and (j)–(k) of the Amended Complaint should be GRANTED, and the motion to dismiss the declarations sought in paragraphs (d), (l), and (m) should be DENIED.

b.    **Paragraphs 153(i) and 154**

59.    In Paragraphs 153(i) of the Amended Complaint, Plaintiffs seek a declaration "[t]hat the Amended and Restated Master Declaration is void and of no effect" because it was not approved by a vote of the APPOA members in compliance with the North Carolina Planned Community Act ("NCPCA"), N.C.G.S. § 47F-2-117. (ECF No. 34, at p. 11.)  In Paragraph 154, Plaintiffs

> request declaratory relief that the Master Declaration may only be amended with the approval of lot owners holding at least 67% of the votes in the Association, per the requirements of the Planned Community Act ("PCA"), and that any amendment to the contrary is void and of no effect. While Defendant Association was created prior to the PCA, certain provisions of the PCA apply to planned communities created prior to 1999, "unless the articles of incorporation or the declaration expressly provides to the contrary."  N.C. Gen. Stat. § 47F–1–102(c) (emphasis added). N.C. Gen. Stat. § 47F–2–117 deals with the process of amending a declaration.  Because the original 1989 Master Declaration does not expressly contradict N.C. Gen. Stat. § 47F–2–117, Defendant Association must abide by N.C. Gen. Stat. § 47F–2–117 requiring 67% of the lot owners to vote on amendments.  Alternatively, Plaintiffs seek declaratory relief that the Master Declaration may only be amended with approval of at a least a majority of the votes of owners.

(ECF No. 22, at ¶ 154.)

60.     With regard to Plaintiffs' request for a declaration that any amendment to the Master Declaration and the Amended and Restated Master Declaration are "void and of no effect" because they were not approved by 67% of the APPOA membership as required by the NCPCA, any claim based on the Board's failure to seek approval by vote of the members as required by the NCPCA accrued on the date that the amendments were recorded. All of the amendments at issue in this action were recorded on or before February 13, 2013. Therefore, any claim based on Paragraphs 153(i) and 154 fail because they were not filed within six years following the date on which the amendments were recorded and are barred by the statute of limitations.[14]

61.     With regard to Plaintiffs' requested alternative declaration that the Master Declaration can only be amended by approval of at least a majority of members, this claim relies on the member vote requirement adopted as part of the Eleventh Amendment to the Master Declaration. The Twelfth, Thirteenth, and Fifteenth Amendments, as well as the Amended and Restated Master Declaration, all were recorded after adoption of the Eleventh Amendment, but were recorded on or before February 13, 2013. (ECF No. 22, at ¶¶ 76–83.) Again, the claim for

---

[14] The Court notes that, although not argued by the parties, the more logical statute of limitations to apply to Plaintiffs' claims for a declaration that the amendments are void for failure to comply with the vote requirement imposed by the NCPCA would be the three year statute of limitations on actions "[u]pon a liability created by statute, either state or federal, unless some other time is mentioned in the statute creating it." N.C.G.S. § 1-52(2). The NCPCA does not provide a statute of limitations for actions to enforce its provisions.

declaratory relief based on the Board's failure to comply with the majority vote requirement is barred by the six-year statute of limitations.

62. Therefore, the Court finds that the only underlying claims in Plaintiffs' declaratory judgment action that survive Defendants' Motion to Dismiss are Paragraphs 153(d), (l), and (m).

## B. Count II – Breach of Fiduciary Duty

63. As to their second claim, Plaintiffs allege that "all individuals who have served on the Board of Directors since at least February 2013 have breached their fiduciary duties to both Plaintiffs and the Association[.]" (ECF No. 22, at ¶¶ 161–62.) Plaintiffs purport to bring the breach of fiduciary duty claim "individually and derivatively" on behalf of the APPOA. (*Id.* at ¶ 161.) Specifically, Plaintiffs allege that Defendants breached their fiduciary duties to Plaintiffs in the following ways:

a. By acquiescing in a scheme by which investors and developers are not required to pay annual assessments and special assessments to the Association, even though they own or have owned lots that are subject to the Master Declaration.

b. By using assessments to subsidize operations of the Recreational Amenities and APPI, even though the Recreational Amenities were intended to be for-profit enterprises and are not part of the common areas.

c. By using assessments to subsidize operations of APR, even though APR is a for-profit enterprise.

d. By implementing a marketing scheme to benefit developers and owners of existing homes, to the detriment of Plaintiffs.

e. By attempting to impose impermissible assessment and fees on owners, including the membership initiation fee.

f. In other ways as may be shown through discovery in this matter.

(*Id.* at ¶ 158.)

64.    Defendants move to dismiss Plaintiffs' claims for breach of fiduciary duty on the grounds that: (a) Plaintiffs lack standing to bring derivative claims on behalf of APPOA and to bring individual claims (ECF No. 30, at pp. 12–19); (b) Plaintiffs' allegations fail to support a claim for breach of fiduciary duty (*id.* at pp. 19–22); and (c) Plaintiffs' claims for breach of fiduciary duty are barred by the three-year statute of limitations (*Id.* at pp. 22–23). The Court finds persuasive Defendants' contention that Plaintiffs have not sufficiently alleged a breach of fiduciary duty and, therefore, need only address that argument.

65.    In order to establish a claim for breach of fiduciary duty, the plaintiff must show that: (1) defendant owed plaintiff a fiduciary duty; (2) defendant breached his fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff. *Farndale Co., LLC v. Gibellini*, 176 N.C. App. 60, 68, 628 S.E.2d 15, 20 (2006).

66.    As a preliminary matter, the Court considers the nature of the fiduciary duty owed by the Directors. "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). North Carolina courts have identified two types of fiduciary relationships. The first type "arise[s] from 'legal relations'"— e.g., attorney and client, partners, principal and agent, and similar relationships. *S.N.R. Mgmt.*

*Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008) (quoting *Rhone-Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp. 2d 540, 546 (M.D.N.C. 1999)). The second includes relationships "that exist 'as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other.'" *Id*. This second *de facto* fiduciary relationship—through "superiority and influence" — "is a demanding one." *Lockerman v. S. River Elec. Membership Corp.*, 794 S.E.2d 346, 352 (N.C. Ct. App. 2016). "Only when one party figuratively holds all the cards—all the financial power or technical information, for example— have North Carolina courts found that the 'special circumstance' of a fiduciary relationship has arisen." *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C. App 615, 621, 730 S.E.2d 763, 767 (2012).

67. In the Amended Complaint, Plaintiffs allege that "[a]t all relevant times, a special relationship existed under which the Plaintiffs reposed trust and confidence in the officers and directors of the Association, and the officers and directors of the Association had certain fiduciary duties with respect to Plaintiffs and the Association as a whole." (ECF No. 22, at ¶ 156.) To the extent this allegation can be construed as alleging that the Directors owed *de facto* individual fiduciary duties to Plaintiffs personally, the Court concludes that such an allegation fails. First, the allegations in the Amended Complaint do not arguably plead facts sufficient to establish a personal fiduciary relationship. Plaintiffs do not allege any facts that would support a claim that the Directors held positions of superiority and influence over individual

Plaintiffs. Second, in their Brief in Opposition, Plaintiffs do not argue that the Directors owed them personal, or *de facto*, fiduciary duties.

68. Plaintiffs also allege that the Directors owed fiduciary duties to the APPOA. A director of a non-profit corporation must "discharge his duties as a director . . . (1) [i]n good faith; (2) [w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) [i]n a manner the director reasonably believes to be in the best interests of the corporation." N.C.G.S. § 55A-8-30(a)(1)–(3). Similarly, an officer of a non-profit corporation must "discharge his duties under that authority: (1) [i]n good faith; (2) [w]ith the care an ordinarily prudent person in like position would exercise in similar circumstances; and (3) [i]n a manner the officer reasonably believes to be in the best interests of the corporation." N.C.G.S. § 55A-8-42(a)(1)–(3).

69. The standard of conduct applicable to officers and directors is subject to review under the business judgment rule:

> [t]he business judgment rule operates primarily as a rule of evidence or judicial review and creates, first, an initial evidentiary presumption that in making a decision the directors acted with due care (i.e., on an informed basis) and in good faith in the honest belief that their action was in the best interest of the corporation, and second, absent rebuttal of the initial presumption, a powerful substantive presumption that a decision by a loyal and informed board will not be overturned by a court *unless it cannot be attributed to any rational business purpose.*

Russel M. Robinson, II, *Robinson on North Carolina Corporation Law* § 14.6, at 281 (5th ed. 1995) (emphasis added); *see Holland v. Warren*, 2020 NCBC 90, at *67–72 (N.C. Super. Ct. Dec. 15, 2020) (applying business judgment rule to actions of a board

of directors of a non-profit corporation). To rebut the initial presumption that the directors acted with "due care," a plaintiff "must present 'more than bare allegations of breaches of fiduciary duties on the part of directors.'" *Holland v. Warren*, 2020 NCBC LEXIS 146, *32 (N.C. Super. Ct. December 15, 2020) (citations omitted). "Specifically, in order to survive a motion to dismiss, the Complaint 'must allege, in other than conclusory terms, that the board was inattentive or uninformed, acted in bad faith, or that the board's decision was unreasonable." *Green v. Condra*, 2009 NCBC 21, at *96 (N.C. Super. Ct. Aug. 14, 2009) (citation omitted).

70. The Court has thoroughly reviewed the allegations in the Amended Complaint and concludes that they amount to nothing more than claims of dissatisfaction with certain actions taken by the Directors because those actions impacted Plaintiffs more harshly as owners of vacant lots. Plaintiffs do not expressly allege that the Directors were inattentive to their duties, acted in bad faith or disloyal towards the APPOA, nor would the facts alleged support such a claim. To the contrary, the current allegations suggest that the Board acted reasonably in the interests of the APPOA and the Albemarle Plantation, attempting to preserve and increase the value of the properties owned by all members and to distribute the obligations among members of the APPOA in a rational manner. While Plaintiffs perceive that they have been disadvantaged because they own vacant lots, the Board is not obligated to act only, or even primarily, in the best interests of vacant lot owners. Rather, the Board owes its duties to the APPOA and *all* of its members.

71. In addition, the alleged breaches are based primarily on actions taken by the Directors under authority granted by the amendments to the Master Declaration with which Plaintiffs take issue in this action. Plaintiffs appear to contend that the Directors' actions were improper because those amendments should be considered void and, consequently, the Directors lacked authority. Here, all of the alleged breaches contained in Plaintiffs' breach of fiduciary claim appear to be actions which were specifically permitted under the governing Amended and Restated Declaration. For example, the breach alleged in Paragraph 158(a)—that Defendants "acquiesce[ed] to a scheme by which investors and developers are not required to pay annual assessments"—is authorized by Article Three, Section 13 of the Amended and Restated Declaration. Similarly, the alleged improper creation and adjustment of assessments on members and use of those assessments to subsidize recreational amenities and support marketing efforts referred to in Paragraphs 158(b)–(e) were also permissible actions of the Board under the Amended and Restated Declaration. Plaintiffs have not alleged sufficient facts in the Amended Complaint to support their conclusory claim that actions taken by the Board in conformity with the amendments and the Amended and Restated Declaration are breaches of the Directors' fiduciary duties. Nevertheless, since it is at least possible that Plaintiffs could allege such additional facts if given the opportunity, the Court believes Plaintiffs should be granted the opportunity to amend their complaint. *See First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191, 749 S.E.2d 289, 292 (2013) ("The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]").

72. Therefore, the Court concludes that the Motion to Dismiss Plaintiffs' breach of fiduciary duty claims should be GRANTED, and the claim should be DISMISSED WITHOUT PREJUDICE.

THEREFORE, IT IS ORDERED that the Motion to Dismiss is GRANTED, in part, and DENIED, in part, as follows:

1. Defendants' Motion to Dismiss Count I is GRANTED with respect to Paragraphs (a)–(c), (e)–(h), and (j)–(k), and DENIED with respect to Paragraphs 153(d), (l), and (m).

2. Defendants' Motion to Dismiss Count II for breach of fiduciary duty is GRANTED, and Count II is DISMISSED WITHOUT PREJUDICE.

SO ORDERED, this the 19th day of January, 2021.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases